IN THE CIRCUIT COURT OF THE CITY OF ST. LOUIS
STATE OF MISSOURI

| | |
|---|---|
| TREINNEA RUSSELL, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Case No. |
| ) | |
| METROPOLITAN ST. LOUIS ) | Division No. |
| SEWER DISTRICT, ) | |
| Serve at:  2350 Market Street ) | |
|            St. Louis, MO 63103 ) | |
| ) | |
| Defendant. ) | JURY TRIAL DEMANDED |

# Petition

### Introduction

1.  Plaintiff Treinnea Russell ("Russell") brings this action against Defendant Metropolitan St. Louis Sewer District ("MSD") for violations of the Family and Medical Leave Act ("FMLA"), 29 U.S.C. § 2601, *et seq.*

### Parties

2.  Russell is a resident of the City of St. Louis.

3.  MSD is a municipal corporation and a political subdivision of the State of Missouri with offices and facilities for conducting business in the City of St. Louis.

### Jurisdiction and Venue

4.  This Court has subject matter jurisdiction over this action under 29 U.S.C. § 2617.

5.  This Court has personal jurisdiction because the parties reside and/or conduct business in the City of St. Louis.

6.  Venue is proper in this Court under § 508.010 because Russell was first injured by Defendant in the City of St. Louis, Missouri.


EXHIBIT 1

**Facts**

7. In 2014, Russell's husband passed away leaving her as a single mother of two children with special needs. Each child has been diagnosed with Autism, and her older child has also been diagnosed with Asperger's Syndrome.

8. Russell, who is African American, began working for MSD on March 4, 2019 as a Minority & Business Enterprise ("MWBE") Inspector.

9. At that time, Russell became an "employee" of MSD within the meaning of the FMLA.

10. MSD is a covered "employer" within the meaning of the FMLA.

11. During her first year, Russell's work met or exceeded MSD's legitimate expectations.

12. By mid-March of 2020, Russell was eligible to take FMLA leave should the need arise.

13. That month, MSD ordered its employees, including Russell, to work remotely because of COVID-19.

14. The new remote schedule required her to be in the field (away from home) from approximately 7:00 a.m. to 3:30 p.m. during the workweek.

15. This became a problem for Russell when both of her children's schools switched to remote-only learning. At the time, they were ages 7 and 17. Because of their serious health conditions, Russell could not leave them at home all day without any supervision.

16. At first, to balance the needs of her family with her duties to MSD, Russell started using her 30-minute lunchbreak to check on her children.

17. But when her direct supervisor, Larry Woods, MSD's Diversity Construction Supervisor, found out, he became angry and ordered her not to check on them during lunch.

18. Upon information and belief, Woods was surveilling Russell's whereabouts using the GPS tracker in her car.

19. Upon information and belief, Woods did not surveil any employees at MSD other than Russell during COVID-19.

20. In early April 2020, Russell applied for protected leave under the FMLA to care for her children who have serious health conditions.

21. In seeking FMLA leave, Russell, who is not an attorney or HR expert, communicated back-and-forth with LaKesha Prince. Prince is a member of MSD's human resources department.

22. Among other things, Russell made it clear to Prince that she was interested in taking *intermittent* FMLA leave to care for her children.

23. On Tuesday, April 14, 2020, Prince wrote back to Russell saying that intermittent leave was not available. Prince copied Shonnah Parades, Director of Diversity, on the communication.

24. Although she had obtained medical certifications for her children, she did not forward them to MSD because Prince had told her that intermittent leave was not available and Parades had not corrected Prince.

25. Russell's application for FMLA leave was denied at the end of April for failure to submit certifications.

26. Neither Prince, Parades, nor anyone else at MSD ever informed Russell that intermittent FMLA leave *was* available to her.

27. Had Russell been properly advised by Prince or anyone else at MSD, she would have sent in the medical certifications that she had already obtained.

28. Lacking the rights and protection of intermittent FMLA leave, Russell attempted to continue succeeding in her job while also ensuring the well-being of her severely disabled children.

29. Parades authorized a new work schedule enabling Russell to be home by 1:30 p.m. and to complete the rest of her duties there.

30. On or about July 8, 2020, Russell's schedule was modified a second time. The new schedule required her to be in the field from 8:30 a.m. to 1:30 p.m., and then to work at home from 1:30 p.m. to 4:30 p.m.

31. Although she did not have the protection that comes with approved FMLA leave, Russell was able to make the alternative schedules work through most of August 2020.

32. On or about August 24, 2020, the new school year began for Russell's children. Because of COVID-19, the schools had a mix of remote and in-person learning.

33. On or about August 26th, Russell met with Woods who warned her that unless she resumed her regular schedule by January 2021, MSD would likely let her go.

34. That evening, Russell received a school bus schedule stating that morning pick-up would be at 7:11 a.m. and afternoon drop off would be at 4:02 p.m. In practice, the school bus typically arrived several minutes early or late every day.

35. When Russell forwarded the bus schedule to Woods, he responded by changing her schedule a third time to 7:30 a.m. to 3:30 p.m. effective September 1, 2020.

36. This was problematic because on mornings when the school bus was late, Russell struggled to begin her schedule on or before 7:30 a.m.

37. In early September, Woods instructed Russell that she could no longer use vacation or sick time in less than 8-hour increments to take her children to medical appointments, even though upon information and belief, other employees who did not need intermittent FMLA leave were permitted to use such time off in less than 8-hour increments.

38. On September 14th, Russell complained to HR about Woods' hostility toward her need to care for her children, and again sought protected leave from HR. But HR did nothing, let alone send Russell any FMLA-related paperwork.

39. On September 18th, Russell again complained to HR about Woods retaliating against her. She concluded her message by saying, "I feel that I was single[d] out and treated differently due to being a single mother from MSD's Diversity and Inclusion Department."

40. Less than two weeks later, on September 30th, Russell was terminated under the false pretext of "stealing time" and for alleged poor performance.

41. Although Woods was primarily responsible for engineering Russell's termination, the decision to fire her was formally approved by MSD's CEO, Brian Hoelscher.

42. Upon information and belief, Hoelscher did not have any direct personal knowledge of the circumstances surrounding Russell's application for FMLA leave or the alleged basis for her termination. Instead, upon information and belief, he relied primarily if not exclusively on information gathered by Woods or by others at Woods' direction and did not conduct his own independent investigation of the situation or even speak with Russell).

43. At the termination meeting, Belinda Farrington, MSD's Assistant Director of Human Resources, cautioned Russell that in the future, "you should consider your kids having a disability before applying for a job."

44. Woods did not object to Farrington's statement or otherwise censure her.

45. Russell has been financially harmed by her unlawful termination by MSD.

## Count I
## FMLA Interference
## 29 U.S.C. § 2615(a)(1)

46. Russell re-alleges and incorporates by reference, as though fully set forth herein, paragraphs 1 through 42 and further alleges as follows:

47. MSD is covered by the FMLA pursuant to 29 U.S.C. § 2601, *et seq.*, because it is a public agency that employed 50 or more employees for each working day for at least 20 workweeks in the year prior to Russell's attempted intermittent FMLA leave.

48. Russell was an FMLA-eligible employee because she was employed by MSD for a year prior to requesting FMLA leave and had been employed by MSD for over 1,250 hours in the 12-month period prior to her request for intermittent FMLA leave.

49. Russell was entitled to FMLA leave because of her need to care for her children who have serious health conditions.

50. In early April 2020, Russell notified LaKesha Prince that she would need to take intermittent FMLA leave to care for her children who have serious health conditions.

51. MSD denied and/or discouraged Russell from a benefit to which she is entitled under the FMLA (*i.e.*, intermittent leave) by erroneously advising her that intermittent leave was not available to her and ultimately firing her.

52. MSD's action foreclosed Russell's rights under the FMLA, including, but not limited to, the right to be free from harassment for exercising her rights under the law.

53. As a direct and proximate result of MSD's wrongful acts and omissions, Russell has suffered financial losses, including lost wages and benefits. Russell is also entitled to liquidated damages and attorneys' fees and costs, and other damages as recoverable by law.

WHEREFORE, Plaintiff Treinnea Russell prays for judgment in her favor against Defendant MSD for lost wages and other benefits of employment, liquidated damages, post-judgment interest, attorneys' fees and costs, and such other and further relief as the Court deems just and proper.

## Count II
## FMLA Retaliation
## 29 U.S.C. § 2615(a)(2)

54. Russell re-alleges and incorporates by reference, as though fully set forth herein, paragraphs 1 through 50, and further alleges as follows:

55. Russell was eligible to take intermittent FMLA leave and attempted to exercise her FMLA rights by applying for intermittent FMLA leave.

56. Russell was qualified for her position and had performed her job duties effectively prior to the acts complained of herein.

57. Russell suffered adverse employment actions for attempting to exercise her FMLA rights in that she was subjected to surveillance by her supervisor; her supervisor unilaterally changed her work schedule changed to make it more difficult to ensure the safety of her children; and he was instrumental in having her terminated.

58. MSD's alleged reason for terminating Russell's employment is pretextual in that MSD fired Russell because she attempted to exercise her rights under the FMLA and complained to HR about Woods' retaliation against her.

59. MSD's conduct constitutes unlawful retaliation against Russell in violation of her rights under the FMLA. 29 U.S.C. § 2615(a).

60. As a direct and proximate result of MSD's wrongful acts and omissions, Russell has suffered financial losses, including lost wages and benefits. Russell is also entitled to liquidated damages and attorneys' fees and costs, and other damages as recoverable by law.

WHEREFORE, Plaintiff Treinnea Russell prays for judgment in her favor against Defendant MSD for lost wages and other benefits of employment, liquidated damages, post-judgment interest, attorneys' fees and costs, and such other and further relief as the Court deems just and proper.

## Jury Trial Requested

61. Russell hereby requests a jury trial on all jury triable claims and issues in this case.

Respectfully submitted,

ERNST LAW FIRM LLC

By: */s/ Edwin C. Ernst, IV*
Edwin C. Ernst, IV #57521
Jeffrey W. Ernst #58658
13321 N. Outer Forty Rd., Suite 600
St. Louis, Missouri 63017
(314) 690-1724 Telephone
(314) 448-4300 Facsimile
eddie@ernstlawfirm.net
jeffrey@ernstlawfirm.net

*Attorneys for Plaintiff*
*Treinnea Russell*